IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE:

**RAYMOND J. SCULLY AND**                 CASE NO: 18-50993
**SHIRLEY HUE SCULLY**
    Debtors                                                           Chapter 7

_____

**PEDESTAL BANK, successor in interest to**
**COASTAL COMMERCE BANK**

                 Plaintiff                         ADV. CASE NO. 18-5041

versus

**RAYMOND J. SCULLY AND**
**SHIRLEY HUE SCULLY**
        Defendants

## DEFENDANTS' TRIAL BRIEF

NOW INTO COURT, through undersigned counsel come **Defendants RAYMOND J. SCULLY AND SHIRLEY HUE SCULLY** ("Scullys") who present the following trial brief

**I. Facts**

Ray Scully started in the boat building and repair business around 1970. As a result of the terrible downturn in the oil business in the mid-1980s, the Scullys filed a Chapter 7 bankruptcy in October 1986.

Beginning in 1996, the Scullys were part owners of a shipbuilding and repair business, known as A&B Industries of Morgan City, Inc. ("A&B"). The business had survived several business cycles in the boat business.

However, in 2012, the Scullys both experienced life-threatening health issues. Ray Scully was diagnosed with kidney cancer and Shirley Scully had a heart attack. Both of them had to

undergo extensive medical treatment. It was then that they began to work on estate planning to transfer certain assets to family members, in case one or both of them died suddenly.

In 2013, John A. Lancon ("Lancon"), a customer of A&B, had approached the Scullys about participating in a boat business, known as SM Energy, LLC ("SM Energy"), which owned several vessels. On September 30, 2013, Ray Scully obtained a 50% membership interest in SM Energy in exchange for agreeing to guaranty a loan from First National Bank of Jeanerette ("FNBJ") to refinance three smaller boats and to proceed with the purchase of a larger vessel to expand the fleet. After the time that Mr. Scully became a member of SM Energy, Lancon ran the company, made all decisions, and controlled the company's finances. He generally kept Mr. Scully in the dark about the company's finances, refused to give Mr. Scully specific information, and told him it was "none of his business."

On or about August 31, 2013, as part of the refinancing transaction for the smaller boats for SM Energy, LLC, the Scullys completed and signed a personal financial statement (the "PFS"). Raymond Scully originally provided the PFS to First National Bank of Jeanerette ("FNBJ") and later gave a copy to Coastal Commerce Bank. Under the question, "Have either you or your spouse ever been adjudged a bankrupt?" he checked "No." A banker and an attorney had previously told Mr. Scully that it was not necessary to report any bankruptcy filings after 10 years. The 1986 bankruptcy was nearly 30 years old by this time.

On March 31, 2014, SM Energy entered into a loan transactions with Coastal Commerce Bank to refinance the smaller boats, purchase a much larger vessel, and to obtain operating capital. Lancon and Ray Scully executed personal guaranties for the debt incurred by SM Energy.

In May 2014, Ray Scully and David Acosta, his effective son in law, sold a property they

Page 2

18-05041 - #33   File 09/09/19   Enter 09/09/19 16:17:02   Main Document   Pg 2 of 15

jointly owned on 10 Beach Road, Roxie, Mississippi (the "Roxie Property") for $995,000.00. Scully and Acosta sold the Roxie Property because the maintenance of the property had become too burdensome. Mr Scully had previously thought the property was more valuable. However, as a result of the weaker market for Mississippi land, the real estate agent indicated this price was the highest they could obtain. The net proceeds of this sale of approximately $188,000.00 were paid to A&B because A&B had paid the original downpayment on the property and all expenses for the property.

On August 29, 2014, the Scullys purchased approximately four acres of land with two mobile homes near Dayton, Texas (the "Dayton Property"). Initially, the Scullys rented this property to Joshua Cheramie and Jared Cheramie (the "Cheramies", two of their grandsons) for $1,200.00 per month for one year. On March 3, 2016, the Scullys sold the Dayton Property to the Cheramies for $116,610.00 and took back a deed of trust in the same amount. The Scullys forgave the first annual installment of $39,064.00 on March 3, 2016, and the second and third annual installments of $40,424.80 and $39,647.40 on April 4, 2017. Despite the fact that this was part of their estate plan, if the Cheramies had not made the rental payments, it was the Scullys' intention to take back the Dayton Property.

On June 1, 2015, the Scullys donated the property located at 1028B Landry Lane, Morgan City, Louisiana (the "Stephensville Property") to their three daughers, Crystal Torgrimson, Rae Ann Richie, and Kathy Petty. The Scullys retained a usufruct in the Stephensville Property. The donation was made as part of the Scullys' estate planning because of health problems that had started in 2012. Mr. Scully had inherited an interest in this property from his mother and purchased the remaining interests from other family members in 2004 for approximately $41,000.00. At the time of the

Page 3

18-05041 - #33  File 09/09/19  Enter 09/09/19 16:17:02  Main Document  Pg 3 of 15

donation, the Scullys had no idea they were in any type of financial trouble because A&B was still performing well and Lancon had not informed Scully of any potential problems with SM Energy.

Also as part of his estate plan, Ray Scully formed KRC Properties, LLC ("KRC") on August 10, 2015. "KRC" are the first letters in each daughter's first name. All of the family members were supposed to be part of KRC, but Mr. Scully was the only member in the beginning for purposes of expediency. On August 17, 2015, KRC purchased a house, located at 1800 Badt Avenue, Thibodaux, Louisiana (the "KRC House") to allow any grandchildren to attend college at Nicholls State University. Subsequently, Mr. Scully added his three daughters as members in September 2015 and added Sean Torgrimson, Lynze Belle, and Jeffrey Richie as members in April 2016. Sean Torgrimson performs all of the repairs and maintenance on the KR House. Ms. Belle, a granddaughter, currently lives in the KRC House.

In early April 2016, Ray Scully was surprised to discover that SM Energy was having problems making payments to Coastal Commerce Bank. Lancon had not indicated to Mr. Scully that SM Energy was having difficulty paying the notes. Lancon also had been taking money from SM Energy and using it to pay his personal expenses. Mr. Scully immediately took steps to make sure that Lancon could not take any more money from SM Energy. Around this time, Mr. Lancon attempted suicide and went into the hospital.

On or about April 26, 2016, Ray Scully received a letter from Coastal Commerce Bank, stating that the SM Energy loan was in default. Mr. Scully scrambled to put together a plan to save SM Energy, which he sent to Coastal Commerce on May 5, 2016. Coastal Commerce originally agreed to the workout proposal but backed out at the last minute.

On May 12, 2016, Ray Scully sold property located at 2217 Swetman Blvd., Gulfport,

Mississipi (the "Gulfport Property") to Acosta Family Rentals for $75,000.00. The net proceeds of the sale were $73,219.79. The Scullys were unable to continue to maintain the GulfPort Proeprty and had to sell it.

David Acosta is the owner of Acosta Family Rentals and is (effectively) the Scullys' son in law. Shortly after the closing, Shirley Scully paid David Acosta a total of $75,000.00 for funds previously loaned to them by Acosta, stemming from another transaction previously funded by Acosta. The funds received by the Scullys were used toward the payment of the Acosta loan but that loan was unrelated to the Gulfport Property.

The Gulfport Property was in dire need of repair, so Mr. Acosta renovated the house using much of his own labor. Acota Family Rentals sold the Gulfport Property in May 2017, one year later, for $164,000.00. Mr. Acosta was also an owner of A&B. As a result of A&B's continuing cash flow problems, Mr. Acosta deposited all of the net sale proceeds ($148,122.00) into A&B's bank account to keep the company running, since A&B was experiencing cash flow problems by this time. Over the years, Scully had sold several investment properties to Acosta, which Acosta went on to repair and sell for a profit, including two properties on Duke Street, Morgan City, Louisiana. The reason that Mr. Scully did so is that because of his prior health problems, Mr. Scully did not have the physical capability to repair the properties as did David Acosta.

On September 12, 2016, Coastal Commerce commenced an action for foreclosure and enforcement of the guaranties against SM Energy, Scully, Lancon, and related entities that owned the vessels. In November 2016, Ray Scully, SM Energy, and Coastal Commerce Bank entered into a stipulation to conduct a private sale of the vessels. The stipulation required that Scully and SM Energy produce updated financial statements. The stipulation did not contain any minimum

requirements for the financial statements in order for the private sale process to continue.

In December 2016, Raymond Scully produced an updated financial statement to Coastal Commerce Bank. This financial statement contained errors, primarily consisting of omitting the deed of trust held by the Scullys against the Dayton Property. This omission was a mistake on Mr. Scully's part but was not done to mislead Coastal Commerce Bank.

On August 10, 2017, Coastal Commerce Bank filed a complaint against Ray Scully and various members of his family in the U.S. District Court for the Western District of Louisiana as Case No. 17-1011 for revocation of certain of the transfers discussed above. This case was subsequently transferred to this Court with the filing of Adversary Proceeding No. 18-5034 on August 29, 2018.

As a result of a business slowdown, A&B shut down on November 6, 2017, and filed a Chapter 7 petition on November 7, 2017. The trustee of that Chapter 7 has since liquidated or abandoned the assets of that estate, including the real estate owned by the company.

The Scullys also held legal title to a property located in Porter, Texas (the "Porter Property"). However, the equitable owner of the Porter Property was their daughter, Kathy Petty. Ms. Petty made most of the mortgage payments on the property, maintained the property, paid all of the expenses on the property and lived in the property. In March 2018, Ms. Petty obtained a sale for the Porter Property in the amount of $140,000.00. She wanted to sell the property because she wanted to move into a house owned by her husband. While the net sale proceeds of the Porter Property were made payable to the Scullys, Ms. Petty was the true owner of those funds. Out of the approximately $70,000 in sale proceeds, Ms. Petty allowed her parents to retain about half of the proceeds to pay attorneys and other expenses.

The Scullys filed this Chapter 7 case on August 9, 2018. The Scullys' assets included, among other items, a lot on Lake Palourde Road in Morgan City, interests in KRC Properties, LLC, Shirley Ray Properties, LLC, and Healthcare Trust, Inc., as well as certain vehicles.

**II.  Requirements for nondischargeability must be strictly construed.**

Exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start.  Hudson v. Raggio & Raggio, Inc. (In re Hudson ), 107 F.3d 355, 356 (5th Cir.1997), citing Murphy & Robinson Inv. Co. v. Cross (In re Cross), 666 F.2d 873, 880 (5th Cir.1982).

**III. The Scullys did not commit actual fraud.**

Here, Pedestal appears to be arguing that (A) Mr. Scully obtained credit by false representations by checking no to the question on the financial statement about whether he had ever been adjudged a bankrupt, (B) the Scullys committed actual fraud through silence by failing to continue providing updated financial information to the Bank, and (C) Mr. Scully committed actual fraud by "a fraudulent transfer scheme to transfer his property to other parties close to him and entities in his control in an effort to avoid paying his debts to Coastal Commerce."  All of these assertions are false.

Pursuant to Bankruptcy Code Section 523(a)(2)(A), a debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud is not dischargeable.  Louisiana jurisprudence indicates that the elements of the tort of fraud are a misrepresentation of material fact made with the intent to deceive when there was reasonable or justifiable reliance by the plaintiff and resulting injury.  Chateau Homes by RJM, Inc. v. Aucoin, 97 So. 3d 398, 404 (La. App., 2012), citing Schaumburg v. State

Farm Mut. Auto. Ins. Co., 421 Fed.Appx. 434, 442 (5th Cir.2011). For purposes of the tort of fraud, the intent to deceive is a specific intent. Id.

**A. Mr. Scully did not commit actual fraud by checking no to the question of whether he had ever been adjudged a bankrupt.**

First, the statement was technically correct. Being adjudged a bankrupt was a legal concept contained in the Bankruptcy Act of 1898 and is not contained in the Bankruptcy Code, enacted in 1978. "Upon the filing of a voluntary petition the judge shall hear the petition and make the adjudication or dismiss the petition." Bankruptcy Act, Sec. 18g. Compare with "The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter." Bankruptcy Code, Section 301(b). Under the Bankruptcy Code there is no requirement to be "adjudged a bankrupt" as there was in the Bankruptcy Act.

Given that Scully filed Chapter 7 in 1986 under the Bankruptcy Code, the statement that Scully was never "adjudged a bankrupt" is technically correct. Second, there was no intent to deceive. Mr. Scully was informed by a banker and a lawyer that he did not have to list bankruptcy filings after 10 years. Third, it seems unlikely that Coastal Commerce would turn down a borrower solely because of a 30-year old bankruptcy filing.

**B. The Scullys did not commit fraud through silence by failing to continually inform the Bank about transfers of property.**

Under Louisiana law, fraud may result from silence or inaction. Civil Code Art. 1953. However, "[t]o find fraud from silence or suppression of the truth, there must exist a duty to speak or to disclose information." Greene v. Gulf Coast Bank, 593 So.2d 630 (La., 1992), citing Markey v. Hibernia Homestead Ass'n, 186 So. 757, 764 (La.App.Orl.Cir.1939). "When a claim of fraud is

Page 8

based on silence or suppression of the truth, the plaintiff must prove a duty to speak or to disclose information." Skannal v. Bamburg, 33 So.3d 227, 237 (La. App., 2010), citing Greene, supra. Note that even if there is such a duty, the plaintiff must also prove there was an intent to deceive. See, Chateau Homes, 97 So.3d at 406.

It is also important to note that a "false representation" requires an expressed misrepresentation—oral or written—by the defendant. Silence, or lack of communication, cannot deliver proof by a preponderance of the evidence that Defendant made a false statement with the intent to deceive. In re Hernandez-Abreu, 506 B.R. 307, 311 (Bankr. S.D. Fla., 2014).

Pedestal Bank contends that the PFS created either a contractual duty or a "declaration of will" under Louisiana Civil Code 1757 to disclose information. However, this position assumes that the PFS created an enforceable contract or a declaration of will.

The PFS was not an enforceable contract because it was signed only by the Scullys and does not meet the requirements of a unilateral contract. In Louisiana, the four elements that are required for formation of a contract are: the capacity to contract, mutual consent, a certain object, and a lawful cause. Succession of Duskin v. Mahalia Jackson Residual Family Corp., 153 So.3d 567 (La. App., 2014) citing In re Succession of Flanigan, 06–1402, p. 6 (La.App. 4 Cir. 6/13/07), 961 So.2d 541, 544 (citing Fairbanks v. Tulane University, 98–1228, p. 4 (La.App. 4 Cir. 3/31/99), 731 So.2d 983, 986; La. C.C. arts. 1918, 1927, 1966, and 1971). A contract is unilateral when the party who accepts the obligation of the other does not assume a reciprocal obligation. La. Civ. Code Art. 1907. Thus, a unilateral contract is accepted by the offeree by performance.

Here, the PFS does not satisfy the requirements for a contract, including a unilateral contract. The Plaintiff did not execute the PFS, so there was no mutual consent. There was also no reciprocal

Page 9

18-05041 - #33   File 09/09/19   Enter 09/09/19 16:17:02   Main Document   Pg 9 of 15

obligation to be performed by the bank in exchange for the Scullys executing the PFS. The PFS was also not a unilateral contract in that the bank did not accept the PFS by performance.

In addition, the PFS is not a declaration of will to continually provide information to Coastal Commerce Bank. Neither the Civil Code not case law appears to define a declaration of will. However, the PFS was given by Raymond Scully to FNBJ originally in connection with a prior loan to SM Energy in 2013, using a form provided by that bank. Later a copy of the PFS was provided to Plaintiff as part of the 2014 loan. While it could be argued that Scully agreed to provide updated information to FNBJ as a declaration of will, it is not the case that Scully agreed to do so with Coastal Commerce Bank. This fact is especially true since Scully did not even realize the financial statement form contained the statements regarding such a duty. Scully simply gave Coastal Commerce a copy of the PFS which was used in a prior loan to provide that bank with information regarding his financial condition, not to take on duties stated in the boilerplate language of the form as a declaration of will. Accordingly, Scully did not commit fraud by silence by not informing the bank of the transfers in question at the time they were made because he did not have any legal duty to do so.

**C. The Scullys transfers of property were done for estate planning and legitimate business purposes, not to avoid paying debts to creditors.**

As stated above, the Scullys suffered severe health problems in 2012 which convinced them that they needed to prepare an estate plan to be ready in case one or both of them died suddenly. These events occurred prior to Mr. Scully's original involvement with SM Energy. Accordingly, the transfers in question were put in motion well before SM Energy defaulted on its debt to Coastal Commerce Bank.

Page 10

The case of Husky Int'l Elecs., Inc. v. Daniel Lee Ritz, 136 S.Ct. 1581, 194 L.Ed.2d 655 (2016), is distinguishable from the present case. While in Husky the Supreme Court interpreted "'actual fraud' to encompass fraudulent conveyance schemes, even when those schemes do not involve a false representation," the debtor in that case drained one company of all its assets and transferred them to other companies he owned or controlled. Husky, 136 S.Ct. at 1585, 1590. It is clear from the facts of Husky that the debtor sought to transfer those assets beyond the reach of creditors and had no other legitimate personal or business reason for making those transfers.

In this case, all of the transfers alleged were either for estate planning or business purposes. The donation of the Stephensville house to the Scullys' daughters was done for estate planning, as was the purchase and sale of the Dayton Property and the purchase of the KRC House and donation of the shares. The sales of the Gulfport Property and other properties to Acosta Family Rentals were done to dispose of high maintenance properties and to raise funds to operate A&B.

**IV. False written statements of financial condition (Section 523(a)(2)(B))**

Pedestal Bank appears to argue that (A) Mr. Scully obtained credit by false written statement of financial condition by failing to check yes to the question on the financial statement about whether he had been adjudged a bankrupt, (B) Mr. Scully obtained credit by false written statement of financial condition by failing to disclose changes in financial condition, and (C) Mr. Scully obtained credit by false written statement of financial condition by presenting a financial statement in December 2016 that contained errors. All of these contentions are wrong.

Bankruptcy Code Section 523(a)(2)(B) states that a debt for money, property, services, or an extension, renewal, or refinancing of credit, is nondischargeable to the extent obtained by use of a statement in writing— (i) that is materially false; (ii) respecting the debtor's or an insider's financial

condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive.

### A. Failing to check yes to "being adjudged a bankrupt."

This action does not meet several of the requirements under Section 523(a)(2)(B). First, the statement that Scully was never "adjudged a bankrupt" is technically correct because the Bankruptcy Code contains no legal concept of being "adjudged a bankrupt," as did the Bankruptcy Act. Second, this statement did not concern Scully's current financial condition since the bankruptcy filing was nearly 30 years earlier. Third, Mr. Scully did not check the no box with the intent to deceive since he believed that since the bankruptcy was so old, it did not need to be reported.

### B. There is no provision in the bankruptcy law for a false written statement of financial condition to be made by silence.

Nondischargeability under Section 523(a)(2)(B) requires money, property or credit to be obtained by the use of a statement in writing that satisfies all four requirements. If there is no written statement, then a nondischargeability action cannot be brought under Section 523(a)(2)(B). See, In re Hernandez-Abreu, 506 B.R. 307, 311 (Bankr. S.D.Fla. 2014). Accordingly, Scullys' debt to Pedestal Bank is not nondischargeable under Section 523(a)(2)(B) for not disclosing the transfers of property.

### C. The financial statement given in 2016 was provided pursuant to a stipulation and did not result in the extension or renewal of credit.

In December 2016, Mr. Scully gave Coastal Commerce Bank an updated financial statement that omitted the deed of trust that Scully held on the Dayton Property. This omission was a mistake

on Mr. Scully's part and was not intentional.

This financial statement was given as part of a stipulation that provided for the private sale of the vessels owned or operated by SM Energy. The stipulation required only that a financial statement be given, not that it contained any minimum financial requirements. Accordingly, the fact that this financial statement contained an error did not cause Coastal Commerce Bank to forbear in collection against SM Energy. Given that the financial statement given in 2016 did not result in an extension, renewal or refinancing of credit and was not given with the intent to deceive, the debt is not nondischargeable under Section 523(a)(2)(B).

**V. The Scullys did not commit embezzlement.**

Pursuant to Bankruptcy Code 523(a)(4), a debt for embezzlement is not dischargeable. Under Louisiana law, the crime of embezzlement "is a fraudulent and felonious appropriation of another's property by the person to whom it has been entrusted or into whose hands it has lawfully come. The gist of the offense is a breach of trust. The essence of the offense is the conversion of the property." State v. Hayes, 837 So.2d 1195, 1197 (La., 2003) quoting State v. Smith, 194 La. 1015, 195 So. 523, 525 (1940). "It is an essential element of embezzlement that the property charged to be embezzled was lawfully in the accused's possession by fiduciary relation with the owner. Embezzlement differs from larceny in that the original taking is lawful. The gravamen of the offense is the subsequent felonious conversion of the property with the intent to convert it to the accused's own use." State v. Hayes, 837 So.2d 1195, 1197 (La., 2003) quoting Clark & Marshall, A Treatise on the Law of Crimes, § 12.19, p. 903 (7th ed. 1967).

Here, Pedestal Bank complains that "Scully appropriated funds for his own benefit by transferring immovable properties and the cash proceeds of those properties..." However, the funds

18-05041 - #33   File 09/09/19   Enter 09/09/19 16:17:02   Main Document   Pg 13 of 15

in question were not entrusted to Scully by Coastal Commerce Bank. There is no evidence that the funds borrowed by SM Energy were used for anything other than the purchase or refinance of vessels and the operation of the business. In addition, Scully never had control over SM Energy's funds, which were always controlled by Lancon. Accordingly, no debt owed by the Scullys is nondischargeable because of embezzlement.

WHEREFORE, the Scullys pray that the Complaint be dismissed and for such further relief as is just.

Respectfully submitted,

WEINSTEIN & ST. GERMAIN, LLC

By: /s/ Tom St. Germain
TOM ST. GERMAIN, #24887
1414 NE Evangeline Thruway
Lafayette, LA 70501
Telephone: (337) 235-4001
Fax: (337) 235-4020

Page 14

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE:

**RAYMOND J. SCULLY AND**      CASE NO: 18-50993
**SHIRLEY HUE SCULLY**
    Debtors      Chapter 7

_____

**PEDESTAL BANK, successor in interest to**
**COASTAL COMMERCE BANK**

    Plaintiff      ADV. CASE NO. 18-5041

versus

**RAYMOND J. SCULLY AND**
**SHIRLEY HUE SCULLY**
    Defendants

## CERTIFICATE OF SERVICE

_____ I HEREBY CERTIFY that I have mailed a copy of the foregoing **DEFENDANTS' TRIAL BRIEF,** postage prepaid via regular US mail and/or via ECF to; Pedestal Bank through its attorney of record, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, 601 Poydras Street, Suite 2775, New Orleans, Louisiana 70130.

Lafayette, Louisiana, this 9th day of September, 2019.

                             /s/ Amber V. Talhelm
                             AMBER V. TALHELM
                             Bankruptcy Analyst