In Re: Raymond Joseph Scully, Jr. and    *      CASE NO. 18-50993
Shirley Hue Scully                *      Chapter 7
Debtor(s)                        *
                                    *

**************************************************************************

Pedestal Bank                               Adversary No. 18-05041

**Plaintiff(s)**

v.

Raymond J. Scully, Jr., et al.

**Defendant(s)**

**************************************************************************

### PEDESTAL BANK'S PRETRIAL BRIEF

       Pursuant to the Court's Scheduling Order, Pedestal Bank respectfully submits the following for its Pretrial Brief:

### I.   Introduction

       Pedestal Bank's claim against Debtors, Raymond Scully and Shirley Scully, should be excepted from discharge under Section 523 of the Bankruptcy Code, by reason of the Scullys' pattern of transferring many assets to their relatives, other persons close to them, and entities they controlled in the pre-bankruptcy period. These actions resulted in serious injury to Coastal Commerce Bank. It is undisputed that the Scullys transferred immovable properties, vehicles, and cash to their children, grandchildren, other relations, and corporate entities controlled by them and received no consideration in return for these transfers. These actions constitute actual fraud, because they demonstrate a fraudulent transfer scheme. The Scullys' actions also included

1

misrepresentations, and fraud by silence or failure to disclose, each of which are independently sufficient to satisfy Section 523.

## I. Factual Background

### SM Energy Loan Transaction

This case concerns a claim based upon a Personal Guaranty of a commercial loan transaction in which SM Energy, LLC was the borrower and Coastal Commerce was the lender (the "***SM Energy Loan***").  The amount of credit Coastal Commerce extended to SM Energy, LLC was approximately $5 Million, consisting of a term note and a revolving line of credit.

The defendant, Raymond J. Scully, Jr., was a member of the company along with his then business associate, John A. Lancon. Both men agreed to guaranty the debt of SM Energy, LLC and signed commercial guaranties on or about March 31, 2014.

Mr. Scully was no stranger to the boom and bust cycles of the oil and gas market and the risk of personal guaranties. In the 1980s, Raymond Scully was part owner of a boat business called Scully Brothers Boat Building. Scully previously signed a personal guaranty in connection with Whitney Bank's loan to the business, Scully Brothers Boat Building. Scully Brothers Boat Building defaulted on its loans from Whitney Bank after the  collapse in oil prices in the 1980s. Raymond Scully filed a personal Chapter 7 bankruptcy in the Eastern District of Louisiana on February 7, 1986.

Prior to the execution of the personal guaranty with Coastal Commerce, and prior to the extension of credit, Raymond Scully submitted personal financial statements to Coastal Commerce Bank in connection with the loan (the "***Financial Statement***"). Scully first submitted the Financial Statement on August 31, 2013 to First National Bank of Jeanerette, which was a participant in the

2

SM Energy Loan. Scully later provided a copy of the same Financial Statement to Coastal Commerce Bank.

The Financial Statement contained information regarding the following properties:

**The Roxie Property:** Land and improvements, rural property in Franklin Mississippi, 10 Beach Rd., Roxie Mississippi, owned jointly with David Acosta. (the "Roxie Property") Stated value: $1,230,000.

**The Stephensville Property**: Land and improvements, residential property in St. Martin Parish, located at municipal address 1028 Landry Rd., Stephensville, Louisiana. Stated Value: $400,000.

**The Gulfport Property:** Residential property in Gulfport, Mississippi, located at municipal address 2217 Swetman Blvd, Gulfport, Mississippi. Stated value: $135,000.

**The Porter Property:** Residential property in Porter, Texas located at municipal address 3314 Abbey Field Lane, Porter Texas. Stated value: $160,000.

**Lake Palourde Property:** Industrial lot in Amelia Louisiana where Scully's business, A&B Industries of Morgan City , previously operated. Approximate value: $100,000.

### Default and Notice of Default

The SM Energy Loan had repayment problems starting in 2014. In 2014, SM Energy missed certain payments toward principal as originally agreed upon in the SM Energy Loan, but asked for extensions and other accommodations to make interest only payments. On November 7, 2014, SM Energy requested and received a deferral of amounts due, including making interest only payments in November and December 2014. On January 27, 2015, SM Energy requested and received an additional 4-month period of interest only payments. From June, 2015 to December, 2015, SM Energy made certain payments toward principal and interest, but never made any of the required principal payments thereafter. SM Energy failed to make payments as required beginning in January, 2016, and no deferrals or accommodations were granted for these events of default.

3

On April 7, 2016, Coastal Commerce provided notice of default to SM Energy and to Raymond Scully by certified mail. The default letter that was sent to Raymond Scully was signed for by Shirley Scully on April 26, 2016. The default letter that was sent to SM Energy, LLC at its P.O. Box in Morgan City was signed for by David Acosta on April 11, 2016. Another default letter was sent to Torie Theriot of the Neuner Pate law firm, which acted as counsel for both SM Energy and Raymond Scully, and which was signed for on April 18, 2016.

### Roxie Property

During all this time, the Scullys had been moving assets in a very strong pattern of liquidating and shifting those assets to their relatives, in laws, and entities controlled by them. First, the Scullys owned the Roxie Property at the time of the Financial Statement in August 2013. The Roxie Property is an undeveloped rural property located in Mississippi. Scully sold the Roxie Property in May 2014 for a purchase price of $995,000. Scully received approximately $188,000 in sale proceeds from the Roxie Property which he divided with David Acosta.

Scully did not provide notice to Coastal Commerce of the sale of the Roxie Property.

### Stephensville Property

The Scullys owned the Stephensville Property in indivision at the time of the Financial Statement in August 2013. The Stephensville Property is a residential immovable property located on in an unincorporated part of St. Martin Parish. The Scullys owned the Stephensville Property free and clear. The Scullys donated the Stephensville Property to their daughters, Crystal S. Torgrimson, Kathy Petty, Rae Ann Richie, on or about June 1, 2015.

At the time of this transfer, SM Energy had missed multiple payments and had requested extensions in order to catch up and avoid default.

4

As part of the transfer, the Scullys reserved a usufruct interest in the Stephensville Property, such that they had the right to use the property for life and their daughters, Crystal S. Torgrimson, Kathy Petty, Rae Ann Richie were and are the naked owners of the property. Scully did not provide notice to Coastal Commerce of the donation of the Stephensville Property.

### Gulfport Property

Raymond and Shirley Scully purchased the Mississippi Property in 2011 for the purchase price of $107,000. The Scullys owned the Gulfport Property, a residential immovable property located on Swetman Blvd. in Harrison County, Mississippi at the time of the Financial Statement in August 2013. The Scullys had also owned the Gulfport Property free and clear.

The Scullys sold the Gulfport Property on or about May 12, 2016 to Acosta Family Rentals, LLC. At that time, in May of 2016, Coastal Commerce's loan was in default. Coastal Commerce had caused demand letters to be sent to Mr. Scully advising him that Coastal Commerce would file suit against him for his guaranty liability on April 7, 2016, and to Mr. Scully personally April 14, 2016. Mr. Scully's partner and son in law David Acosta signed the green card acknowledging receipt of the letter on April 11, 2016.

The Scullys and Acosta Family Rentals exchanged cash at the time of the transfer to simulate a sale. Acosta Family Rentals provided a check to the Scullys at the closing on or about May 12, 2016, in the amount of $75,000, representing the purchase price of the property. In the six-day period after the closing from May 12, 2016 – May 18, 2016, however, Shirley Scully paid $75,000 back to David Acosta by writing three separate checks to David Acosta.

Acosta Family Rentals is a Louisiana limited liability company owned by David Acosta. Raymond Scully regards David Acosta as his son-in-law because Acosta is married to Raymond Scully's niece, Melanie Acosta.

Coastal Commerce was provided no notice of the transaction involving the Gulfport property. After Acosta Family Rentals, LLC obtained ownership of the property, it then marketed and sold the property to a third party in May of 2017. Acosta Family Rentals sold the Gulfport Property to a third party for the purchase price of $164,000.

### Dayton Property

Raymond and Shirley Scully did not own the Dayton Property, a residential immovable property located in Dayton, Texas, at the time of the Financial Statement in August 2013. Raymond and Shirley Scully acquired the Dayton Property in August, 2014. After they acquired it in 2014, the Scullys owned the Dayton Property free and clear.

The Scullys transferred the Dayton Property to their grandchildren Joshua and Jared Cheramie, on or about March 3, 2016. At the time of the transfer of the Dayton Property, the SM Energy Loan was in default as SM Energy had failed to make payments due in January, 2016. The Dayton Property is a residential lot with improvements and having a fair market value of approximately $120,000.

The Scullys executed Warranty Deed pursuant to which they purportedly transferred the property subject to an obligation on the part of his grandchildren to pay them $116,000, which was secured by a lien in their favor. That alleged lien was evidenced and affirmed by a Deed of Trust in their favor.

By virtue of the deed of trust and accompanying promissory note, Scully's grandchildren, Jared and Joshua Cheramie were obliged to pay their grandparents, the Scullys, $116,610.00 in respect of the deed of trust. Under the Deed of Trust, in the event of breach or nonpayment Scully and/or Shirley Scully were entitled to take possession of the property from their grandchildren, by way of the trustee, in accordance with the procedures applicable to deeds of trust.

6

Under the Deed of Trust, the indebtedness of $116,610.00 was to be due and payable in three annual installments from Joshua and Jared Cheramie to Raymond and/or Shirley Scully. On or about March 3, 2016, contemporaneously or shortly after the execution of the deed of trust, Raymond and Shirley Scully purported to forgive the first installment of $39,064 by way of a letter executed on that date.

On or about April 4, 2017, Raymond and/or Shirley Scully purported to forgive the second installment of $40,424.80 by way of another letter executed on that date, however, the Scullys accelerated the debt forgiveness and purported to forgive all of the debt at that time

### Porter Texas Property

The Scullys owned the Porter Property, a residential immovable property located in Liberty County, Texas, at the time of the Financial Statement in August 2013. The Porter Property was not owned free and clear – it was subject to a mortgage in favor of a bank

The Scullys sold the Porter Property on or about March 13, 2018 to a third party for the price of $140,000. The Scullys received $69,996.00 in loan proceeds from the sale of the property in Porter Texas  The Scullys distributed the proceeds of the sale to their daughter Kathy Scully Petty, in the amount of $34,998. The Scullys distributed certain of the proceeds of the sale to their attorneys in the amount of $22,450 on March 20, 2018.

Prior to the transfer of the Porter Texas property and the dispersal of the sale proceeds, Coastal Commerce had actually tried to have the property sequestered by court order. The Scullys argued that the property was beyond the jurisdiction of the court, and as a result, the sequestration was denied. They then sold the property and gave the sale proceeds to their daughter. Coastal Commerce was provided no notice of the sale and dispersal of funds.

## KRC Property

Scully had an interest in another immovable property through a limited liability company, KRC Properties, LLC. The principal asset of KRC Properties was and is a piece of immovable property located at 1800 Badt Ave., Thibodaux, Louisiana. Scully held a 100% membership interest in KRC Properties LLC when the entity was formed and when KRC purchased the immovable property.

Scully transferred the membership interests in KRC Properties on two separate occasions. The first of these was a transfer of the membership interests in the company to his daughters, Crystal S. Torgrimson, Kathy Petty, Rae Ann Richie, on September 22, 2015. His daughters gave nothing in return for the membership interests. Scully then made a second donation of the membership interests to other relatives, Sean Torgrimson (Son in Law), Lynze T. Belle (Granddaughter), Jeffrey A. Richie (Son in law), on April 14, 2016.

In that time period, April of 2016, Coastal Commerce's loan was in default. It had caused demand letters to be sent to Mr. Scully advising him that Coastal Commerce would file suit against him for his guaranty liability on April 7, 2016, and to Mr. Scully personally April 14, 2016. Mr. Scully's partner and son in law David Acosta signed the green card acknowledging receipt of the letter on April 11, 2016.

Through the first and second donation of membership interests in KRC Properties, Scully diluted his interest in the company from 100% to approximately 14%. Scully provided no notice to Coastal Commerce of these activities.

## Vehicles

Scully also transferred several vehicles to his family members, many of which were transferred for no consideration, or questionable consideration.

8

In 2016 Scully transferred a 2008 White Chevy Tahoe to Crystal Scully Torgrimson his daughter. Scully admits receiving nothing in return for the 2008 White Chevy Tahoe.

In 2015 Scully transferred a 2013 Black Toyota Corolla to Lynze Belle, his granddaughter. Scully admits receiving nothing in return for the 2013 Black Toyota Corolla.

In 2015 Scully transferred a 2003 White Chevy Silverado to his grandson Noah Michael Belle. Scully admits receiving nothing in return for the 2003 White Chevy Silverado.

In 2017 Raymond Scully transferred a 2013 Silver Chevy Silverado to Jonathan Scully, his nephew. Raymond Scully contends he received cash consideration for the 2013 Silver Chevy Silverado.

In 2016 Raymond Scully transferred a 2011 Silver Ford F150 to his brother Wayne Scully. Raymond Scully contends he received cash consideration for the 2011 Silver Ford F150.

### 2016 Financial Statement

After Coastal Commerce began its efforts to recover from SM Energy, Scully continued to provide false and misleading information, or omissions of information to Coastal Commerce. On or about November 8, 2016, in connection with litigation in the U.S. District Court for the Western District of Louisiana, Coastal Commerce entered into a Stipulation with Scully, SM Energy, and certain of its affiliated entities.

The Stipulaton provided that "The Bank will proceed to obtain deficiency judgments against guarantors but will not execute any judgment until after the vessels are sold and the deficiency amount is thereby determined." The Stipulation also provided "Raymond Scully individually and SM Energy, LLC will produce their most current financial statements to the Bank within ten days of the date of this agreement." As such, Coastal Commerce agreed to forbear its collection activities in exchange for the financial statement.

9

On or about December 22, 2016, Raymond Scully submitted a second personal financial statement to Coastal Commerce. The second personal financial statement misrepresented multiple facts, including omissions of the note and deed of trust which the Scullys retained against the Dayton Property, and omission of other financial property in which the Scullys had an interest.

### III.     Law and Analysis

### A.     The Debt is not Dischargeable Because the Debtor "Actually Defrauded" Coastal Commerce.

Once it became foreseeable that Scully would be called on to satisfy the Personal Guarantee, he systematically conveyed substantially all of his assets to friends and relatives. The breadth of his distributions and their timing, along with the Debtor's personal financial history, show that the Debtor's transfers were motivated by a desire to conceal assets and hinder collection. By engaging in this fraudulent transfer scheme, the Debtor has committed "actual fraud" as that term is defined under 11 U.S.C. § 523(a)(2)(A). Accordingly, the debt owed to Plaintiff is not dischargeable.

A discharge under Chapters 7, 11, 12, or 13 of Title 11 "does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . actual fraud." § 523(a)(2)(A). Until recently the circuit courts have been split as to whether a debtor's scheme to fraudulently convey assets constitutes "actual fraud." The Supreme Court resolved this split in *Husky International Electronics, Inc. v. Ritz* by holding "actual fraud," as that term is used in 11 U.S.C. § 523(a)(2)(A), "encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky Int'l Elecs., Inc. v. Ritz*, 136 S.Ct. 1581, 1594 (2016). As the Court noted, "actual fraud" has two parts: actual and fraud. Id. ("The word 'actual' has a simple meaning in the

context of common-law fraud: It denotes any fraud that involves moral turpitude or intentional wrong.") (citation omitted). "Fraud" is not susceptible of one all-encompassing definition; it can come in many forms, always involving deceit or trickery. *Id*. at 1587. "[A] transfer scheme designed to hinder the collection of debt" clearly satisfies both parts. *Id*. at 1586.

The Debtor has committed the textbook fraudulent conveyance scheme the Supreme Court described in Husky: "Fraudulent conveyances typically involve a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration." *Husky*, 136 S.Ct. at 1587. Here, Debtor has transferred valuable real property, vehicles, and cash to his descendants relatives for little or no consideration. This conduct constituted a scheme which "impairs [Pedestal's] ability to collect on the debt," conduct which "courts and legislatures have used the term 'fraud' to describe . . . from the beginning of English bankruptcy practice." *Id*. "When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." *In re Vickery*, 488 B.R. 680, 690 (10th Cir. BAP 2013) (quoting *Mellon Bank, N.A. v. Vitanovich* (In re Vitanovich), 259 B.R. 873 (6th Cir. BAP 2001).

**B. Scully Had a Duty To Notify Coastal Commerce of Changes in His Financial Condition, But Failed To Do So.**

Bankruptcy courts have held that silence may constitute fraud for purposes of determining exceptions to discharge under section 523. "Courts have consistently found that a debtor's silence regarding a material fact equates to a material representation sufficient to support a denial of discharge." *In re Austin*, 2009 WL 3193167, at *12 (Bankr. W.D.La. Oct. 2, 2009); *In re Hanson*, 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010).

11

Fraud is defined in the Louisiana Civil Code as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." La. C.C. art. 1953. There are three basic elements to an action for fraud: (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to the other party; and (3) the resulting error must relate to a circumstance substantially influencing the other party's contractual consent. *Shelton v. Standard/700 Associates*, 01–0587, p. 5 (La.10/16/01), 798 So.2d 60, 64. See La. C.C. arts. 1953, 1955.

The Civil Code is explicit that a cause of action for fraud may result from silence. The Civil Code states "Fraud may also result from silence or inaction." Civil Code art. 1953. However, in order to find fraud from silence or suppression of the truth, there must exist a duty to speak or disclose information. *Greene v. Gulf Coast Bank*, 593 So.2d 630, 632 (La. 1992). The duty to disclose facts may result from the relationship between the parties, such as in the obligations of a seller in a contract of sale, in an instance of fiduciary duty, or among corporate officers and directors.

As applied to the facts of this case, the starting point is Raymond Scully's personal guaranty by which he guaranteed to pay the debts of SM Energy, LLC to Coastal Commerce Bank. As part of his guaranty, Scully promised as follows on March 31, 2014: "Guarantor will not, without Lender's prior written consent, sell, lease, assign, transfer or otherwise dispose of all or substantially all of Guarantor's assets." *See* Scully Personal Guaranty. There can be little dispute that Scully broke this promise. After signing the guaranty, in which he promised not to transfer his assets, Scully then proceeded to transfer all of his assets to family, friends, and business associates.

But that is not the only promise that Scully broke here. He also promised, in the Personal Financial Statement, to advise Coastal Commerce of changes in his financial condition. Here, the duty is express and in writing. The Scullys do not dispute signing the Personal Financial Statement in which they undertook a duty to disclose information. The document stated as follows:

> Applicant agrees to notify Bank immediately and without delay in the event of any change in Applicant's financial condition or in the financial condition of Applicant's spouse, (when applicable) which materially reduces the means or ability of Applicant to pay all claims or demands.

*See* Personal Financial Statement. That signed writing imposed a duty on Raymond Scully to notify Coastal Commerce of changes in his financial condition. His subsequent failure to notify Coastal Commerce of numerous transfers that diminished his ability to pay debts were therefore "silence regarding material fact[s]" which "equate[d] to a material representation sufficient to support a denial of discharge." *In re Austin*, 2009 WL 3193167, at *12 (Bankr. W.D.La. Oct. 2, 2009); *In re Hanson*, 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010).

## C. <u>The Debt is not Dischargeable Because the Debtor Made a Material Misrepresentation in His Financial Statement</u>

The Debtor represented that he had never been through bankruptcy in his First Financial Statement. This was patently false—the Debtor had filed a personal Chapter 7 bankruptcy in the Eastern District of Louisiana on February 7, 1986. The materiality of this omission is evident from a cursory comparison of the Debtor's two bankruptcy cases. There, as here, he got a loan for his business during an oil boom, secured by his personal guarantee. When boom cycled to bust, and he was called on to satisfy his guarantee, he filed for personal bankruptcy instead. Accordingly, because the Debtor obtained the loan for SM Energy pursuant to his fraudulent financial statement, the debt is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

Section 523(a)(2)(B) of Title 11 of the United States Code provides:

13

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . .
>> (2) for money, property, services, or an extension, renewal, or refinancing of creditor, to the extent obtained by—
>>> (B) use of a statement in writing—
>>>> (i) that is materially false;
>>>> (ii) respecting the debtor's or an insider's financial condition;
>>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>>> (iv) that the debtor caused to be made or published with intent to deceive. . . .

11 U.S.C. § 523(a)(2)(B). The Fifth Circuit has described "materiality" thus:

> A materially false statement is one that paints a substantially untruthful picture of a financial condition by representing information of the type which would normally affect the decision to grant credit. Further, in determining whether a false statement is material, a relevant although not dispositive inquiry is whether the lender would have made the loan had he known the debtor's true situation.

*In re Jordan*, 927 F.2d 221 (5th Cir. 1991) (citations and quotations omitted). Materiality is a concept based on the perspective of the lender deciding whether to extend credit. *In re Goldbeck*, 590 B.R. 881 (Bankr. W.D. Wis. 2018). The fact that the debtor had previously filed bankruptcy to avoid satisfying a guarantee on a debt for a loan for his business is clearly "information of the type which would normally affect the decision to grant credit." The other elements follow easily. It was a statement as to the debtor's financial condition on which Coastal was entitled to reasonably rely. *See In re Lefeve*, 131 B.R. 588, 595 (Bankr. S.D. Miss.1991) ("[T]he element of reliance required by Section 523(a)(2)(A) and (B) is satisfied upon documentary evidence from the debtor's loan file, showing the written terms and conditions of the loan agreement.") (citation omitted). And the Debtor's intent to deceive can be established by a showing of reckless indifference, which is inferable from the surrounding circumstances of the case. *Id.* at 600. All of the requisite elements to block discharge pursuant to section 523(a)(2)(B) are met.

14

**D. The Debt is Alternatively Not Dischargeable Because the Debtor Maliciously and Willfully Injured Plaintiff.**

While the Debtor's fraudulent conveyance scheme and his material misrepresentation made in obtaining the loan from Coastal each independently block discharge under subsections 523(a)(2)(A) and 523(a)(2)(B), respectfully, considered together they demonstrate that the Debtor has willfully and maliciously injured Coastal. Debts for willful and malicious injuries are not dischargeable under the Code. Section 523(a)(6) provides that:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity. . . .

The United States Fifth Circuit has adopted the interpretation of "willful and malicious" set forth in Collier on Bankruptcy, the leading bankruptcy treatise:

> In order to fall within the exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excuse, even in the absence or personal hatred, spite or ill-will. The word 'willful' means 'deliberate or intentional,' a deliberate and intentional act which necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury.

3 COLLIER ON BANKRUPTCY, 523.16 at 523–128 (15th ed.); *see also Vickers v. Home Indemnity Company, Inc.*, 546 F.2d 1149 (5th Cir. 1977). The submission of a false financial statement that produces harm to the creditor by aiding in the false depiction of a sound loan meets the requirements for a willful and malicious injury under section 523(a)(6). *See In re Lefeve*, 131 B.R. 588, 603 (Bankr. S.D. Miss. 1991). Here, the Debtor's conduct is more egregious than a mere misrepresentation. First, the Debtor made a fraudulent representation in the first financial statement in order to obtain a loan for SM Energy. Then, when he was called on to satisfy his

15

Guarantee, the Debtor engaged in a fraudulent conveyance scheme to ensure that Coastal Commerce would never recover on the loan from him. In other words, the Debtor made injury to Coastal Commerce a "necessary" outcome by wrongfully depriving Coastal Commerce of the assets which he listed as being part of his personal wealth and upon which Coastal Commerce relied. This conduct was wrongful and inexcusable even if it was not driven by personal hatred. Thus, 11 U.S.C. § 523(a)(6) provides an additional ground for exception to discharge.

**Conclusion**

The Scullys should not be entitled to a discharge of their debt to Coastal Commerce Bank. Their plan is self-evident. Once the liability on the Personal Guaranty was foreseeable, they systematically transferred all of their wealth, including houses, properties, vehicles, and cash, to friends, family, and business associates. They did not disclose these actions despite undertaking a duty in writing to notify. They then filed bankruptcy. Under these circumstances, the Scullys debts to Coastal Commerce should not and cannot be discharged under Section 523.

/s/ *Joseph P. Briggett*
STEWART F. PECK (#10403)
JOSEPH P. BRIGGETT (#33029)
601 Poydras Street Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
Email: speck@lawla.com; jbriggett@lawla.com
*Counsel for Pedestal Bank*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing was served upon the Defendants / Debtors' counsel, Thomas St. Germain (tstgermain@wienlaw.com), via electronic mail\on this 9th day of September, 2019.

  /s/ *Joseph P. Briggett*

Joseph P. Briggett