## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA

In Re: Raymond Joseph Scully, Jr. and     *      CASE NO. 18-50993
Shirley Hue Scully                       *      Chapter 7
Debtor(s)                                 *
                                            *

**************************************************************************

Pedestal Bank                                Adversary No. 18-05041

**Plaintiff(s)**

v.

Raymond J. Scully, Jr., et al.

**Defendant(s)**

**************************************************************************

## PEDESTAL BANK'S POST TRIAL BRIEF
## WITH PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

NOW INTO COURT, through undersigned counsel comes Plaintiff, Pedestal Bank ("Pedestal") and submits its Post Trial Brief with the following proposed findings of fact and conclusions of law:

**Proposed Findings of Fact:**

### SM Energy Loan Transaction

1. This case concerns a claim based upon a Personal Guaranty of a commercial loan transaction in which SM Energy, LLC was the borrower and Coastal Commerce was the lender (the "***SM Energy Loan***").

2. The amount of credit Coastal Commerce extended to SM Energy, LLC was approximately $5 Million, consisting of a term note and a revolving line of credit. Plaint. Exhibit 3, Promissory Note. Pretrial Stip., ¶ D.12.[1]

3. The defendant, Raymond J. Scully, Jr., was a member of SM Energy along with his then business associate, John A. Lancon. Plaint. Ex. 1, SM Energy Articles; Pretrial Stip., ¶ D.1.

4. Both men agreed to guaranty the debt of SM Energy, LLC and signed commercial guaranties on or about March 31, 2014. Plaint. Exhibit 4, Scully Personal Guaranty; Pretrial Stip., ¶ D.7 – 10.

5. Mr. Scully admitted he understood the boom and bust cycles that are common to the oil and gas market and the risk of personal guaranties. Pretrial Stip., ¶ D.14.

6. In the 1980s, Raymond Scully was part owner of a boat business called Scully Brothers Boat Building. Scully previously signed a personal guaranty in connection with Whitney Bank's loan to the business, Scully Brothers Boat Building. Scully Brothers Boat Building defaulted on its loans from Whitney Bank after the collapse in oil prices in the 1980s. Raymond Scully filed a personal Chapter 7 bankruptcy in the Eastern District of Louisiana on February 7, 1986.

7. Prior to the execution of the personal guaranty with Coastal Commerce, and prior to the extension of credit, Raymond Scully submitted personal financial statements to Coastal Commerce Bank in connection with the loan (the "***Financial Statement***"). Plaint. Ex. 6.

8. Prior to trial, Mr. Scully had testified in a deposition that "The form that I filled out in 2013, I filled out with . . . Mr. Trent [Oliver], in his office in the lobby with his present there when I was filling out the form." Plaint. Exhibit 35, Deposition of Raymond Scully.

---

[1] The Pre-Trial Stipulations of the Parties, submitted on the record herein at Doc. No. 35 and agreed to by all Parties, is referenced herein throughout as "Pretrial Stip.", and the factual stipulations contained in part D therein (pages 3 -10 in that document) are referenced by their paragraph number.

9. In his testimony at trial, Mr. Scully testified that he first submitted the Financial Statement on August 31, 2013 to First National Bank of Jeanerette, which was a participant in the SM Energy Loan. Trial Tran. 9/20/19 p. 29. Scully testified that he later provided a copy of the same Financial Statement to Coastal Commerce Bank. Trial Tran. 9/20/19 p. 30.

10. The Court finds that the testimony provided by Mr. Scully at trial is more credible than that which was provided at the deposition. The Court finds that Mr. Scully first submitted the Financial Statement to First National Bank of Jeanerette, which was a participant in the SM Energy Loan. Prior to the closing of the SM Energy Loan, Mr. Scully provided a copy of the Financial Statement to Coastal Commerce Bank.

11. The Financial Statement contained information regarding the following immovable properties:

> **The Roxie Property:** Land and improvements, rural property in Franklin Mississippi, 10 Beach Rd., Roxie Mississippi, owned jointly with David Acosta. (the "Roxie Property") Stated value: $1,230,000.

> **The Stephensville Property**: Land and improvements, residential property in St. Martin Parish, located at municipal address 1028 Landry Rd., Stephensville, Louisiana. Stated Value: $400,000.

> **The Gulfport Property:** Residential property in Gulfport, Mississippi, located at municipal address 2217 Swetman Blvd, Gulfport, Mississippi. Stated value: $135,000.

> **The Porter Property:** Residential property in Porter, Texas located at municipal address 3314 Abbey Field Lane, Porter Texas. Stated value: $160,000.

> **Lake Palourde Property:** Industrial lot in Amelia Louisiana where Scully's business, A&B Industries of Morgan City, previously operated. Approximate value: $100,000.

Plaintiff. Ex. 6.

12. The Financial Statement provided that Scully held $456,400 in securities and other financial assets, which are itemized at the top of the second page of the Financial Statement. Plaint. Exhibit 6.

13. The Financial Statement provided that Scully owned "Automobiles and other personal property" worth $110,000. *Id.*

14. Scully's "Net Worth" stated in the Financial Statement was $3,968,472. *Id.*

15. The Financial Statement required Scully to sign and acknowledge the following statement:

> Applicant agrees to notify Bank immediately and without delay in the event of any change in Applicant's financial condition or in the financial condition of Applicant's spouse, (when applicable) which materially reduces the means or ability of Applicant to pay all claims or demands.

*Id.*

16. In response to the inquiry in the Financial Statement whether Scully had previously been adjudged bankrupt, Scully answered no. *Id.*

17. This response was not truthful. Scully subsequently admitted that he had in fact filed bankruptcy and been adjudged bankrupt. *Compare* Plaint. Exhibit 6, and Plaint. Exhibit 29 (2016 Financial Statement).

18. Trent Oliver, as representative of Coastal Commerce Bank, credibly testified that Coastal Commerce Bank reviewed and relied upon the Financial Statement prior to funding the SM Energy Loan. Trial Tran. 9/20/19 pp. 142-43.

19. The Court finds that Coastal Commerce reasonably relied upon the Financial Statement and the values stated therein, including the Net Worth figure of $3,968,472. Trial Tran. 9/20/19 pp. 142-43.

### Default and Notice of Default

20. The testimony and evidence adduced at trial showed that SM Energy Loan began to have problems with repayment beginning in 2014.

4

21. In 2014, SM Energy missed certain payments toward principal as originally agreed upon in the SM Energy Loan, but asked for extensions and other accommodations to make interest only payments. Trial Tran. 9/20/19 p. 150.

22. On November 7, 2014, SM Energy requested and received a deferral of amounts due, including making interest only payments in November and December 2014. Defendant's Ex. 1.

23. On January 27, 2015, SM Energy requested and received an additional 4-month period of interest only payments.

24. From June, 2015 to December, 2015, SM Energy made certain payments toward principal and interest, but never made any of the required principal payments thereafter. SM Energy failed to make payments as required beginning in January, 2016, and no deferrals or accommodations were granted for these events of default. Trial Tran. 9/20/2019 p. 152.

25. On April 7, 2016, Coastal Commerce provided notice of default to SM Energy and to Raymond Scully by certified mail. Plaint. Exhibit 7; Trial Tran. 9/20/2019 pp. 153-54.

26. The default letter that was sent to Raymond Scully was signed for by Shirley Scully on April 26, 2016.

27. The default letter that was sent to SM Energy, LLC at its P.O. Box in Morgan City was signed for by David Acosta on April 11, 2016. Plaint. Exhibit 10.

28. Another default letter was sent to Torie Theriot of the Neuner Pate law firm, which acted as counsel for both SM Energy and Raymond Scully. Plaint. Ex. 7.

29. During the period from Scully's submission of the Financial Statement to Coastal Commerce and up until shortly before Scully filed bankruptcy in August 2018, the evidence showed the Scullys were shifting their assets to friends, family, and entities controlled by them in a continuous and systematic pattern.

5

### Roxie Property

30. The Scullys and David Acosta owned the Roxie Property at the time of the Financial Statement in August 2013. Pretrial Stip., ¶ D.19.

31. The Roxie Property is an undeveloped rural property located in Mississippi. Scully sold the Roxie Property in May 2014 for a purchase price of $995,000. Scully received approximately $188,000 in sale proceeds from the Roxie Property which he divided with David Acosta. Pretrial Stip., ¶ D.20-21.

32. Scully did not provide notice to Coastal Commerce of the sale of the Roxie Property.

### Stephensville Property

33. The Scullys owned the Stephensville Property in indivision at the time of the Financial Statement in August 2013. Pretrial Stip., ¶ D.22.

34. The Stephensville Property is a residential immovable property located on in an unincorporated part of St. Martin Parish. The Scullys owned the Stephensville Property free and clear.

35. The Scullys donated the Stephensville Property to their daughters, Crystal S. Torgrimson, Kathy Petty, Rae Ann Richie, on or about June 1, 2015. Pretrial Stip., ¶ D.24.

36. At the time of this transfer, SM Energy had missed multiple payments and had requested extensions in order to catch up and avoid default. Trial Tran. 9/20/2019 p. 150.

37. As part of the transfer, the Scullys reserved a usufruct interest in the Stephensville Property, such that they had the right to use the property for life and their daughters, Crystal S. Torgrimson, Kathy Petty, Rae Ann Richie were and are the naked owners of the property. Pretrial Stip., ¶ D.25. Scully did not provide notice to Coastal Commerce of the donation of the Stephensville Property.

### Gulfport Property

6

38. Raymond and Shirley Scully purchased the Mississippi Property in 2011 for the purchase price of $107,000. Pretrial Stip., ¶ D.26.

39. The Scullys owned the Gulfport Property, a residential immovable property located on Swetman Blvd. in Harrison County, Mississippi at the time of the Financial Statement in August 2013. Pretrial Stip., ¶ D.27.

40. The Scullys owned the Gulfport Property free and clear of liens, mortgages or other encumbrances. Pretrial Stip., ¶ D.28.

41. The Scullys sold the Gulfport Property on or about May 12, 2016 to Acosta Family Rentals, LLC for a purchase price of $75,000.

42. At that time, in May of 2016, Coastal Commerce's loan was in default. Coastal Commerce had caused demand letters to be sent to Mr. Scully advising him that Coastal Commerce would file suit against him for his guaranty liability on April 7, 2016, and to Mr. Scully personally April 14, 2016. Trial Tran. pp. 153-54; Plaint. Ex. 7.

43. Mr. Scully's partner and son in law David Acosta, the owner of the entity that received the Gulfport Property (Acosta Family Rentals, LLC), was also aware of the default because he had signed the green card acknowledging receipt of the default letter on April 11, 2016. Plaint. Ex. 9.

44. The evidence showed that the Scullys and Acosta Family Rentals attempted to simulate a sale by exchanging $75,000 cash at the time of the transfer.

45. Acosta Family Rentals provided a check to the Scullys at the closing on or about May 12, 2016, in the amount of $75,000, representing the purchase price of the property. Pretrial Stip., ¶ D.30.

7

46. In the six-day period after the closing from May 12, 2016 – May 18, 2016, however, Shirley Scully paid $75,000 back to David Acosta by writing three separate checks to David Acosta. Pretrial Stip., ¶ D.32; Trial Tran. 9/20/2019 p. 216.

47. Shirley Scully testified at trial that her husband Ray Scully directed her to make the payments to David Acosta for repayment of a loan, and she admitted that Ray Scully supplied that information to her. Trial Tran. 9/20/2019 p. 215. Neither she nor Ray Scully offered any evidence of the existence of such a loan.

48. Acosta Family Rentals is a Louisiana limited liability company owned by David Acosta. Pretrial Stip., ¶ D.33.

49. Raymond Scully regards David Acosta as his son-in-law because Acosta is married to Raymond Scully's niece, Melanie Acosta. Pretrial Stip., ¶ D.34.

50. Coastal Commerce was provided no notice of the transaction involving the Gulfport property.

51. After Acosta Family Rentals, LLC obtained ownership of the property, it then marketed and sold the property to a third party in May of 2017. Pretrial Stip., ¶ D.35.

52. Acosta Family Rentals sold the Gulfport Property to a third party for the purchase price of $164,000. Pretrial Stip., ¶ D.36.

## Dayton Property

53. Raymond and Shirley Scully did not own the Dayton Property, a residential immovable property located in Dayton, Texas, at the time of the Financial Statement in August 2013. Pretrial Stip., ¶ D.38.

54. Raymond and Shirley Scully acquired the Dayton Property in August, 2014. After they acquired it in 2014, the Scullys owned the Dayton Property free and clear. Pretrial Stip., ¶ D.39, 40.

55. The Scullys transferred the Dayton Property to their grandchildren Joshua and Jared Cheramie, on or about March 3, 2016. Pretrial Stip., ¶ D.40. At the time of the transfer of the Dayton Property, the SM Energy Loan was in default because SM Energy had failed to make payments due in January, 2016. Trial Tran. 9/20/2019 pp. 153-54.

56. The Dayton Property is a residential lot with improvements, including mobile homes, and the evidence showed it had a fair market value of approximately $120,000.

57. The Scullys executed a Warranty Deed pursuant to which they purportedly transferred the property subject to an obligation on the part of his grandchildren to pay the Scullys $116,000, which was secured by a lien in their favor. That alleged lien was evidenced and affirmed by a Deed of Trust in the Scullys' favor. Pretrial Stip., ¶ D.42.

58. By virtue of the deed of trust and accompanying promissory note, Scully's grandchildren, Jared and Joshua Cheramie were obliged to pay their grandparents, the Scullys, $116,610.00 in respect of the deed of trust. Pretrial Stip., ¶ D.43.

59. Under the Deed of Trust, in the event of breach or nonpayment Scully and/or Shirley Scully were entitled to take possession of the property from their grandchildren, by way of the trustee, in accordance with the procedures applicable to deeds of trust. Pretrial Stip., ¶ D.44.

60. Under the Deed of Trust, the indebtedness of $116,610.00 was to be due and payable in three annual installments from Joshua and Jared Cheramie to Raymond and/or Shirley Scully. Pretrial Stip., ¶ D.45.

61. On or about March 3, 2016, contemporaneously or shortly after the execution of the deed of trust, Raymond and Shirley Scully purported to forgive the first installment of $39,064 by way of a letter executed on that date. Plaint. Exhibit 26; Pretrial Stip., ¶ D.46.

62. On or about April 4, 2017, Raymond and/or Shirley Scully purported to forgive the second installment of $40,424.80 by way of another letter executed on that date, however, the Scullys accelerated the debt forgiveness and purported to forgive all of the debt at that time. Plaint. Exhibit 26. Pretrial Stip., ¶ D.47.

**Porter Texas Property**

63. The Scullys owned the Porter Property, a residential immovable property located in Liberty County, Texas, at the time of the Financial Statement in August 2013. Pretrial Stip., ¶ D.48.

64. The Porter Property was not owned free and clear – it was subject to a mortgage in favor of a bank. Pretrial Stip., ¶ D.49.

65. The Scullys sold the Porter Property on or about March 13, 2018 to a third party for the price of $140,000. Pretrial Stip., ¶ D.50.

66. The Scullys received $69,996.00 in loan proceeds from the sale of the property in Porter Texas. Pretrial Stip., ¶ D.51.

67. The Scullys distributed the proceeds of the sale to their daughter Kathy Scully Petty, in the amount of $34,998. The Scullys distributed certain of the proceeds of the sale to their attorneys in the amount of $22,450 on March 20, 2018. Pretrial Stip., ¶ D.52.

68. The Scullys received no consideration in return for their transfer of $34,998 to Kathy Scully Petty on March 13, 2018. Pretrial Stip., ¶ D.53.

69. The Scullys' gratuitous transfer of $34,998 to Kathy Scully Petty on or about March 13, 2018 was less than six months prior to the date they filed for bankruptcy.

70. The Scullys were insolvent at the time of the gratuitous transfer of $34,998 to Kathy Scully Petty on or about March 13, 2018. Pretrial Stip., ¶ D.

71. Prior to the transfer of the Porter Texas property and the dispersal of the sale proceeds, Coastal Commerce had actually tried to have the property sequestered by court order. Trial Tran. 9/20/2019 p. 68. The Scullys argued that the property was beyond the jurisdiction of the court, and as a result, the sequestration was denied. Coastal Commerce was provided no notice of the sale and dispersal of funds.

### KRC Property

72. Scully created a limited liability company, KRC Properties, LLC in 2015. Plaint. Exhibit 28. Pretrial Stip., ¶ D.56.

73. When Scully formed the property in summer, 2015, Scully held a 100% membership interest in KRC Properties LLC.  Plaint. Exhibit 28; Pretrial Stip., ¶ D.56.

74. The principal asset of KRC Properties was and is a piece of immovable property located at 1800 Badt Ave., Thibodaux, Louisiana.  Pretrial Stip., ¶ D.54.

75. Subsequent to the acquisition of the property in Thibodaux, Scully transferred the membership interests in KRC Properties on two separate occasions. Pretrial Stip., ¶ D.57.

76. The first of these transfers was a transfer of the membership interests in the company to his daughters, Crystal S. Torgrimson, Kathy Petty, Rae Ann Richie, on September 22, 2015. *Id.*

77. His daughters gave nothing in return for the membership interests. *Id.*

78. Scully then made a second donation of the membership interests to other relatives, Sean Torgrimson (Son in Law), Lynze T. Belle (Granddaughter), Jeffrey A. Richie (Son in law), on April 14, 2016. Pretrial Stip., ¶ D.58.

79. Scully received nothing in return for these membership interests either. *Id.*

11

80. In the time period in which Scully was donating the interests in KRC, Coastal Commerce's loan was in default. Trial Tran. 9/20/2019 p. 153.

81. Coastal Commerce had caused demand letters to be sent to Mr. Scully advising him that Coastal Commerce would file suit against him for his guaranty liability on April 7, 2016, and to Mr. Scully personally April 14, 2016. *Id.*

82. Through the first and second donation of membership interests in KRC Properties, Scully diluted his interest in the company from 100% to approximately 14%. Pretrial Stip., ¶ D.59. Scully provided no notice to Coastal Commerce of these activities.

### Vehicles

83. Scully also transferred several vehicles to his family members, many of which were transferred for no consideration, or questionable consideration.

84. Scully's Financial Statement provided that as of August 31, 2013 he owned "Automobiles and other property" worth a total of $110,000. Plaint. Exhibit 6.

85. In 2016 Scully transferred a 2008 White Chevy Tahoe to Crystal Scully Torgrimson, his daughter. Scully admits receiving nothing in return for the 2008 White Chevy Tahoe. Pretrial Stip., ¶ D.60, 61; Trial Tran. 9/20/2019, p. 117.

86. In 2015 Scully transferred a 2013 Black Toyota Corolla to Lynze Belle, his granddaughter. Scully admits receiving nothing in return for the 2013 Black Toyota Corolla. Pretrial Stip., ¶ D.62, 63; Trial Tran. 9/20/2019, p. 117.

87. In 2015 Scully transferred a 2003 White Chevy Silverado to his grandson Noah Michael Belle. Scully admits receiving nothing in return for the 2003 White Chevy Silverado. Pretrial Stip., ¶ D.64, 65; Trial Tran. 9/20/2019, p. 117-18.

88. In 2017 Raymond Scully transferred a 2013 Silver Chevy Silverado to Jonathan Scully, his nephew. Raymond Scully contends he received cash consideration for the 2013 Silver Chevy Silverado, but provided no evidence of receiving any such consideration. Pretrial Stip., ¶ D.66; Trial Tran. 9/20/2019, p. 118.

89. In 2016 Raymond Scully transferred a 2011 Silver Ford F150 to his brother Wayne Scully. Raymond Scully contends he received cash consideration for the 2011 Silver Ford F150, but provided no evidence of receiving any such consideration. Pretrial Stip., ¶ D.67; Trial Tran. 9/20/2019, p. 118.

## 2016 Financial Statement

90. The testimony and evidence showed that after Coastal Commerce began its efforts to recover from SM Energy, Scully continued to provide false and misleading information, or omissions of information to Coastal Commerce.

91. On or about November 8, 2016, in connection with litigation in the U.S. District Court for the Western District of Louisiana, Coastal Commerce entered into a Stipulation with Scully, SM Energy, and certain of its affiliated entities. Pretrial Stip., ¶ D.68.

92. The Stipulaton provided that "The Bank will proceed to obtain deficiency judgments against guarantors but will not execute any judgment until after the vessels are sold and the deficiency amount is thereby determined." Pretrial Stip., ¶ D.69.

93. The Stipulation also provided "Raymond Scully individually and SM Energy, LLC will produce their most current financial statements to the Bank within ten days of the date of this agreement." Pretrial Stip., ¶ D.70.

94. As such, Coastal Commerce agreed to forbear its collection activities in exchange for the financial statement.

95. On or about December 22, 2016, Raymond Scully submitted a second personal financial statement to Coastal Commerce. Plaint. Exhibit 29.

96. The second personal financial statement contained multiple misrepresentations of materials facts. Plaint. Ex. 29.

97. The second personal financial statement omitted the fact that the Scullys held a note and deed of trust against the Dayton Property. *Id.*

98. The Scullys' second personal financial statement omitted the fact that the Scullys continued to own an interest in a real estate investment trust, AR Global, worth approximately $45,000. *Id.*

**Scully's Knowledge of Insolvency**

99. The evidence and testimony established that Scully was aware of his declining financial condition before the transfers at issue in this case.

100.    Mr. Scully's tax returns and his own testimony showed that his income decreased precipitously from 2014 to 2016.

101.    In 2014, Mr. Scully's income was approximately $496,000. Trial Tran. 9/20/2019 p. 10.

102.    In 2015, Scully's income decreased to $396,000. Trial Tran. 9/20/2019 p. 12.

103.    In 2016 Scully's income decreased to negative $189,000. Trial Tran. 9/20/2019 p. 13

104.    The evidence showed that Mr. Scully was aware of the downturn in the offshore oil and gas industry upon which his income depended, and which would trigger his obligations under the Guaranty. That downturn began in late 2014.

105.    Mr. Scully admitted that SM Energy, LLC was in the business of offshore oil and gas services. Trial Tran. 9/20/2019 p. 16.

14

106. On February 23, 2015, Mr Scully admitted to authorizing several sales of oil and gas stock which were precipitously declining, including Abraxas Pete, Petrosonic Energy, Samson Oil & Gas, and Baron Energy. Trial Tran. 9/20/2019 p. 15.

107. Mr. Scully admitted he was aware at this time that the price of oil had dropped from approximately $100 per barrel to approximately $50 per barrel. Trial Tran. 9/20/2019 p. 16.

108. Trent Oliver, as representative of Coastal Commerce, credibly testified that he had attempted to notify Raymond Scully of the nonpayment by SM Energy of its debts, but Mr. Scully did not respond. Trial Tran. 9/20/2019 p. 152.

**Proposed Conclusions of Law:**

Actual fraud

1. A discharge under Chapters 7, 11, 12, or 13 of Title 11 "does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . actual fraud." § 523(a)(2)(A).

2. "Actual fraud," as that term is used in 11 U.S.C. § 523(a)(2)(A), "encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky Int'l Elecs., Inc. v. Ritz*, 136 S.Ct. 1581, 1594 (2016).

3. The Supreme Court had held that "actual fraud" has two parts: actual and fraud. *Id*. ("The word 'actual' has a simple meaning in the context of common-law fraud: It denotes any fraud that involves moral turpitude or intentional wrong.") (citation omitted).

4. "Fraud" is not susceptible of one all-encompassing definition; it can come in many forms, always involving deceit or trickery. *Id*. at 1587.

5. "[A] transfer scheme designed to hinder the collection of debt" clearly satisfies both parts. *Id*. at 1586.

15

6.   "When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." *In re Vickery*, 488 B.R. 680, 690 (10th Cir. BAP 2013) (quoting *Mellon Bank, N.A. v. Vitanovich* (In re Vitanovich), 259 B.R. 873 (6th Cir. BAP 2001).

7.   "Fraudulent conveyances typically involve **1) a transfer to a close relative, 2) a secret transfer, 3) a transfer of title without transfer of possession, or 4) grossly inadequate consideration**." *Husky*, 136 S.Ct. at 1587 (numbering supplied).

8.   Although any of the above factors may be sufficient to show fraudulent intent, the Debtors' conveyances of property, as shown in this case, have exhibited three of those four factors.

9.   First, as a matter of law, the Debtor has transferred valuable real property, vehicles, and cash to close relatives prior to the petition. The property so transferred includes the following: the Gulfport Property, the Dayton Texas Property, the membership interests in KRC Properties, LLC, the Stephensville Property, the $34,998 in cash proceeds of the Porter Texas property sale, the 2008 White Chevy Tahoe, 2013 Black Toyota Corolla, 2003 White Chevy Silverado, 2013 Silver Chevy Silverado, and the 2011 Silver Ford F150.

10. Second, as a matter of law, the Debtor has transferred the property described above for either no consideration or grossly inadequate consideration, prior to the petition.

11. Third, as a matter of law, the Debtor has transferred title of property without transfer of possession prior to the petition—specifically the Stephensville Property.

12. Because the evidence shows that multiple factors evidencing fraudulent transfer are present, and those factors appear repeatedly with respect to at least ten transfers of the Debtors' property, the evidence is more than sufficient to show a fraudulent transfer scheme.

13. The transfers described constitute a scheme which "impairs [Pedestal's] ability to collect on the debt," conduct which "courts and legislatures have used the term 'fraud' to describe . . . from the beginning of English bankruptcy practice."

Fraud by silence

14. Silence may constitute fraud for purposes of determining exceptions to discharge under section 523.

15. "Courts have consistently found that a debtor's silence regarding a material fact equates to a material representation sufficient to support a denial of discharge." *In re Austin*, 2009 WL 3193167, at *12 (Bankr. W.D.La. Oct. 2, 2009); *In re Hanson*, 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010).

16. Fraud is defined in the Louisiana Civil Code as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." La. C.C. art. 1953.

17. There are three basic elements to an action for fraud: (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to the other party; and (3) the resulting error must relate to a circumstance substantially influencing the other party's contractual consent. *Shelton v. Standard/700 Associates*, 01–0587, p. 5 (La.10/16/01), 798 So.2d 60, 64; *see also* La. C.C. arts. 1953, 1955.

18. The Civil Code states "Fraud may also result from silence or inaction." Civil Code art. 1953.

19. In order to find fraud from silence or suppression of the truth, there must exist a duty to speak or disclose information. *Greene v. Gulf Coast Bank*, 593 So.2d 630, 632 (La. 1992).

20. The duty to disclose facts may result from the relationship between the parties, such as in the obligations of a seller in a contract of sale, in an instance of fiduciary duty, or among corporate officers and directors.

21. The Guaranty, which was not disputed, constitutes the law between the parties, and it states: "Guarantor will not, without Lender's prior written consent, sell, lease, assign, transfer or otherwise dispose of all or substantially all of Guarantor's assets." *See* Scully Personal Guaranty, Plaint. Ex. 4, p. 3.

22. The covenants contained in the Personal Financial Statement, are likewise the law between the parties, and it required Scully to advise Coastal Commerce of changes in his financial condition, as follows:

> Applicant agrees to notify Bank immediately and without delay in the event of any change in Applicant's financial condition or in the financial condition of Applicant's spouse, (when applicable) which materially reduces the means or ability of Applicant to pay all claims or demands.

*See* Personal Financial Statement, Plaint. Ex. 6.

23. As a matter of law, Raymond Scully had a duty to notify Coastal Commerce of changes in his financial condition. His subsequent failure to notify Coastal Commerce of numerous transfers that diminished his ability to pay debts were therefore "silence regarding material fact[s]" which "equate[d] to a material representation sufficient to support a denial of discharge." *In re Austin*, 2009 WL 3193167, at *12 (Bankr. W.D.La. Oct. 2, 2009); *In re Hanson*, 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010).

Material Misrepresentation

24. Section 523(a)(2)(B) of Title 11 of the United States Code provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . .

(2) for money, property, services, or an extension, renewal, or
refinancing of creditor, to the extent obtained by—
    (B) use of a statement in writing—
        (i) that is materially false;
        (ii) respecting the debtor's or an insider's financial
        condition;
        (iii) on which the creditor to whom the debtor is liable
        for such money, property, services, or credit reasonably
        relied; and
        (iv) that the debtor caused to be made or published with
        intent to deceive. . . .

11 U.S.C. § 523(a)(2)(B).

25. "A materially false statement is one that paints a substantially untruthful picture of a financial condition by representing information of the type which would normally affect the decision to grant credit. Further, in determining whether a false statement is material, a relevant although not dispositive inquiry is whether the lender would have made the loan had he known the debtor's true situation." *In re Jordan*, 927 F.2d 221 (5th Cir. 1991) (citations and quotations omitted).

26. Materiality is a concept based on the perspective of the lender deciding whether to extend credit. *In re Goldbeck*, 590 B.R. 881 (Bankr. W.D. Wis. 2018).

27. The fact that the debtor had previously filed bankruptcy to avoid satisfying a guarantee on a debt for a loan for his business is clearly "information of the type which would normally affect the decision to grant credit."

28. [T]he element of reliance required by Section 523(a)(2)(A) and (B) is satisfied upon documentary evidence from the debtor's loan file, showing the written terms and conditions of the loan agreement. *See In re Lefeve*, 131 B.R. 588, 595 (Bankr. S.D. Miss.1991).

29. As a matter of law, the omission of Scully's prior bankruptcy was a materially false statement used to obtain credit.

19

<u>Malicious and Willful Injury</u>

30. Debts for willful and malicious injuries are not dischargeable under the Code which provides that:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity. . . .

31. The United States Fifth Circuit has adopted the interpretation of "willful and malicious" set forth in Collier on Bankruptcy:

> In order to fall within the exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excuse, even in the absence or personal hatred, spite or ill-will. The word 'willful' means 'deliberate or intentional,' a deliberate and intentional act which necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury.

3 COLLIER ON BANKRUPTCY, 523.16 at 523–128 (15th ed.); *see also Vickers v. Home Indemnity Company, Inc*., 546 F.2d 1149 (5th Cir. 1977).

32. The submission of a false financial statement that produces harm to the creditor by aiding in the false depiction of a sound loan meets the requirements for a willful and malicious injury under section 523(a)(6). *See In re Lefeve*, 131 B.R. 588, 603 (Bankr. S.D. Miss. 1991).

33. Moreover, as a matter of law, the Debtor made injury to Coastal Commerce a "necessary" outcome by wrongfully depriving Coastal Commerce of the assets which Scully listed as being part of his personal wealth and upon which Coastal Commerce relied.

34. As a matter of law, the record shows that Scully intentionally transferred these assets to his family and friends in order to deny Coastal Commerce recovery on the Guaranty.

<u>Entry of Declaratory Judgment and Money Judgment</u>

20

35. Should the Court determine that Raymond and/or Shirley Scully's debts to Coastal Commerce are nondischargeable, the Court is authorized, first to render judgment determining that the debt is nondischargeable, which is plainly within the Court's core jurisdiction. *In re Morrison*, 555 F.3d 473, 479 (5th Circuit 2009).

36. The Fifth Circuit has also held that upon determining that a debt is nondischargeable, bankruptcy courts have the further power to enter money judgments liquidating the amount of the nondischargeable debt. *Id.* at 479-80.

37. The Court finds that the amount of the nondischargeable debt owed by the Debtors is the amount of the Proofs of Claim in favor of Coastal Commerce, filed in the total amount of $4,826,524.29, and which have not been objected to. *See* Claim no. 1 & 2.

38. **[In the alternative]** The Court finds that the total amount of the nondischargeable debt owed by the Debtors is the value of the property transferred by the Debtors, in accordance with the value attributed to those properties in the record, as follows:

39. Damages resulting from the transfer of the Gulfport Property is $160,000 per the "Market Value" attributed to that property in Scully's 2013 Personal Financial Statement. Plaint. Ex. 6.

40. Damages resulting from the transfer of the Dayton Texas Property is $116,610 per the value of the loan on that property as evidenced by Scully's Warranty Deed documents. Pretrial Stip., ¶ D.43.

41. Damages resulting from the transfer of the membership interests in KRC Properties, LLC are $145,000 per the "Market Value" attributed to that property in Scully's 2016 Personal Financial statement. Plaint. Ex. 29.

42. Damages resulting from the Stephensville Property are $400,000 per the "Market Value" attributed to that property in Scully's 2013 Personal Financial Statement. Plaint. Ex. 6.

43. Damages resulting from the transfer of the cash proceeds of the Porter Texas property sale are $69,996.00, which is the amount of the sale proceeds the Scullys received and transferred to third parties. Pretrial Stip., ¶ D.51.

44. Damages resulting from the transfer of the Automobiles are $110,000 per the values attributed to Automobiles and other personal property in Scully's 2013 Personal Financial Statement. Plaint. Ex. 6.

45. The damages resulting from the transfer of the foregoing assets, total $997,606.

WHEREFORE, Coastal Commerce requests that the Court enter judgment in its favor and against the Debtors, declaring the Scullys' debts to Coastal Commerce are nondischargeable under Section 523 of the Bankruptcy Code, and further rendering judgment that Coastal Commerce's nondischargeable claim is determined to be in the amount of its Proofs of Claim, $4,826,524.29, or, in the alternative, in the market value of the assets transferred by the Debtors pre-petition, $997,606.

/s/ *Joseph P. Briggett*
STEWART F. PECK (#10403)
JOSEPH P. BRIGGETT (#33029)
601 Poydras Street Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
Email: speck@lawla.com; jbriggett@lawla.com
*Counsel for Pedestal Bank*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing was served upon the Defendants / Debtors' counsel, Thomas St. Germain ([tstgermain@wienlaw.com](mailto:tstgermain@wienlaw.com)), via electronic mail\on this 2nd day of December, 2019.

  */s/ Joseph P. Briggett*

Joseph P. Briggett